Filed 5/20/15  P. v. Heartsman CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

<table>
<tr><td>THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL A. HEARTSMAN,<br><br>     Defendant and Appellant.</td><td>A135202<br><br>(Alameda County<br>Super. Ct. No. C166800)</td></tr>
</table>

Defendant Michael A. Heartsman appeals a judgment entered upon a jury verdict finding him guilty of the murder of Ditiyan Franklin (Pen. Code,[1] § 187, subd. (a)), the attempted murder of Lionel Harris (§§ 187, subd. (a), & 664), and possession of a firearm by a felon (§ 12021, subd. (a)(1)), and finding true firearm allegations.  He was sentenced to 25 years to life for murder and an additional 25 years to life for a firearm enhancement (§ 12022.53, subd. (d)), and received concurrent sentences for the other charges.  He contends on appeal that he was denied his right to effective assistance of counsel, that the prosecutor and the trial judge committed misconduct, and that the trial court committed evidentiary and sentencing error.  We shall affirm the judgment.

## I.  BACKGROUND

### A.  The Shooting

At about 2:20 on the afternoon of May 25, 2011, a City of Oakland police officer heard six to eight gunshots while he was on duty in East Oakland.  Soon thereafter, he

---

[1] All undesignated statutory references are to the Penal Code.

heard that a victim had been found at Ritchie Street and Olive Street. He went to that location and found the victim, later identified as 17-year-old Ditiyan Franklin, lying facedown in a driveway. Franklin's eyes were partially open. Franklin had suffered gunshot wounds to his upper arm, torso, and thigh, and died from a gunshot that pierced his lungs and heart.

Another officer who arrived at the scene saw a bicycle on Ritchie Street and moved it to the curb. Two African-American males, later identified as Lionel Harris and his brother, came up to him. One of them asked if he could have the bike. The officer told him he could not have it, and the pair started to walk away. The officer asked, "Hey, was he riding the bike when this happened?" The response was something like, "Maybe," or "I think so."

Seven casings were found at the scene, six from a .45 caliber weapon and one from a nine-millimeter weapon. The casings followed a route from the street to the driveway where Franklin died. No weapon was found on Franklin.

### B. Lionel Harris's Testimony

Lionel Harris, the victim of the attempted murder, testified that defendant killed Franklin.[2]

Harris testified that Franklin was his best friend. Although Harris was no longer a student at Castlemont High, he had sat in on some of Franklin's classes the day of the killing.[3] As they left the school, they met up with a friend called Tay, and they headed to Tay's house. As they walked, Harris saw defendant across the street. He knew defendant by the nickname of "Fat Mike" or "Nut Case Mike."[4] Defendant was with someone

---

[2] Harris testified reluctantly, under subpoena. He had previously been subpoenaed to testify at defendant's preliminary hearing, but had failed to appear. He testified that he did not appear because he did not want to be seen as a snitch, and was afraid of being murdered. He eventually testified at the preliminary hearing after he was arrested and brought to court in handcuffs.

[3] Franklin was a senior in high school, and was about to graduate.

[4] During the week and a half before the shooting, Harris had been sitting in on classes at Castlemont High, and had seen defendant hanging around in the area every day.

2

Harris had never seen before, who was wearing a red and black baseball cap with a "C" on it, for the Cubs.

Harris, Franklin, and Tay went to Tay's house. After about 15 minutes, Franklin and Harris left to go to Franklin's house. They rode on Harris's bicycle together, with Harris on the handlebars. On their way, they saw someone named Cleonte Kennedy, whom Harris did not like because his friend, Franklin's brother, had had a fight with him. He had seen defendant and Kennedy together at Castlemont about a year before the killing.

As Franklin and Harris rode down Ritchie Street, a white Honda came around the corner and stopped. Harris recognized the driver as the person he had seen with defendant at Castlemont earlier that day. Defendant opened the passenger door and started shooting with a semiautomatic pistol. Franklin "took off running," and Harris could see that he had been shot. Harris turned and ran in a different direction. He heard a second shot fly past him, and saw where the bullet hit the ground. Harris heard more shots as Franklin fled around a corner. After a minute or two, Harris walked back and saw that the car was gone. He found Franklin lying facedown on top of some carpets in a driveway, his head slightly to the side. He was bleeding, his mouth was wide open, and his eyes were halfway open and "rolled in his head." He was not breathing and did not respond when Harris spoke to him.

Police officers arrived and told Harris to move back. He did not tell the officers he was a witness because he did not want to talk to them; he explained, "where I'm from, you can't do that. You'll get killed for that. You can't do that. You can't talk to any law enforcement whatsoever." He only spoke to police officers in July, reluctantly, when they contacted him.

Harris was shown a video clip of the area after the killing, as police officers examined the scene. In the video, Harris's brother, who had come to the scene, approached a police officer and asked about the bike, as Harris stood behind him. The officer asked if Franklin had been on the bike when it happened, and when he was told "yes," he told the two young men the bike would have to be used for evidence.

3

Harris believed the term "Nut Case" referred to a gang and that the gang was also known as the Case Boys. He had seen members of the Nut Case gang hanging out with members of another gang, DNI, getting along well. He had seen defendant with members of the DNI gang and the Nut Case gang.

Franklin testified that at the time of the killing, he was in a street crew or street gang called the Taliban Mafia. About two years before the killing, Tay had had a fight with a member of the Nut Case gang. Less than a year before the killing, Harris had been shot in the leg, and he thought the Case Boys had something to do with it. At the time, he refused to provide a statement to the police, "[b]ecause you could be murdered for that." He did not want to be a snitch. After Harris was shot, he heard that a member of the Case Boys had been killed and that the Taliban Mafia was suspected to be involved in the killing.

Harris and the jury were shown a video of defendant singing a rap song, "Hella Shit." Harris said the video showed defendant, his brother, and a rapper named Rico. Part of the video was taken near a youth center, Youth Uprising, which was next door to Castlemont High. He explained that some of the lyrics in the video used coded language, meaning that the words meant something other than their literal meaning. One of the lyrics in the video was, "Somebody disrespecting, I'm gonna bounce out and get it, get it." According to Harris, that meant that "[y]ou're gonna jump out of a car and you're gonna kill the person." The lyric "Yeah, I'm the veteran. We better than the rest of them, knocking them all down until [we] the last [one] standing . . . . 'N' word," meant, "Kill everybody." "To all you haters, I've been known to jack a player," meant "Rob people." "223s hollow drums sound is how them choppers rang," referred to AK-47 automatic weapons and their bullets. "Yelling out the wrong squad, banging motherfuckas," meant "Don't yell out another gang."

## C. The Investigation

Sergeant Steven Nowak of the Oakland Police Department's homicide division investigated the crimes.

4

### 1. Anonymous Information About Shooter and Car

The day of the killing, both a local resident and an anonymous informant told Nowak that the car involved was a white Toyota. Harris later told Nowak he believed the car was a white Honda Accord. Nowak testified that people could confuse Hondas and Toyotas.

Nowak interviewed more than a dozen witnesses. Some of these, whom he referred to as "refused citizens," did not want to be identified, but he used the information they provided in his investigation. A "refused citizen," for instance, might give information on names, nicknames, motives for the crime, and vehicle descriptions. They were often afraid of being branded "a snitch," because in areas where many crimes took place, those who helped the police or even spoke with them risked being made outcasts, injured, or killed.

An informant told Nowak the killer was a heavyset Black male. Nowak also received anonymous phone calls from three "refused citizens" giving him the name of Nut Case Mike and telling Nowak he was affiliated with Youth Uprising.[5] Another officer told him that defendant was Nut Case Mike, and defendant matched the physical description given to Nowak by a witness the day of the shooting. There was no evidence that pointed toward anyone except defendant being responsible for Franklin's death.

### 2. Identification of Harris and Interview

During the investigation, Nowak learned that someone besides Franklin was "associated with that bicycle." On the evening of the shooting, Franklin's mother told him that Franklin had been coming home from school with a person she knew only as "L." The next day, Nowak received anonymous calls from people who said "L. Dolge" had been with the victim and that they were friends.

Nowak continued to try to find out who "L. Dolge" was. Franklin's grandmother told Nowak she knew L. Dolge, and someone else at Franklin's home said L. Dolge's first name was Lionel, and gave a possible address. Police officers who went to the home

---

[5] Nowak explained that the "Cases" gang was a subset of the Nut Cases.

on July 3, 2011, put Nowak in touch with Harris, and Harris was brought to the police department to speak with Nowak the following day.

In the interview, Harris told Nowak and another officer that they had been to Franklin's high school, Castlemont High, where Franklin had submitted some work for his senior project. They were riding on a bike together, with Harris on the handlebars. A white Honda Accord, with no license plates, approached. The front passenger door opened, and a "chubby guy" jumped out of the car and started shooting at Harris and Franklin, the gun in his right hand. The pair ran in different directions, and Harris heard multiple gunshots. When the gunshots stopped, he found Franklin lying motionless, his mouth open, dead. Harris said he and Franklin were looking at each other. He said the shooter was "Fat Mike" or "Nut Case Mike," whom he had seen many times in the past at Youth Uprising and with whom he had spoken. He positively identified a photograph of defendant as the shooter in a photographic lineup.

Harris told the officers that at the time of the shooting, he saw the driver, who was wearing a black and red Chicago Cubs cap. He had seen the driver about 10 minutes earlier at Castlemont, with Cleonte, whom they had "tension" with. He did not see Cleonte at the scene of the shooting.

Harris told the officers he and Franklin were members of a group, which he later acknowledged was a gang, called the Taliban Mafia. There had been tension between the Taliban Mafia and another gang, the Case gang, for a year or two. Franklin's brother had had a fight with Cleonte in the past, and had beaten him. Mike was a member of the Case gang.

Nowak testified that Harris had accurately described Franklin's mouth as open, and that he would have had to be close to Franklin to notice that fact. Harris had also accurately described details that few people would have known, such as bullets "tearing through the fence," the direction in which Franklin fled, and where he died.

### 3. Investigation at Castlemont High School

Nowak went to Castlemont High, the high school Franklin attended, and spoke with security staff. He learned that a few hours before the shooting, three people had

6

driven up to the school and picked a fight with another student whose first name began with an "L." Nowak spoke with that student and determined the incident was not connected to the killing. The student told him someone named Cleonte Kennedy had picked a fight with him. Nowak later viewed security footage taken at Castlemont High School on the day of the killing, and saw three people getting out of a white Chevrolet Corsica. One of them was Rondell Hampton, who was a heavyset African-American male. The other two were Cleonte Kennedy and Willy Smith. Nowak later recovered the Corsica and found a black and red cap in it, although not a Cubs cap. Nowak testified that black and red caps were common in Oakland. Nowak concluded the Corsica was not the car Harris had described at the scene of the shooting because it was a American car and was too big.[6]

### 4. Defendant's Arrest

Nowak arrested defendant on July 6, 2011. Defendant told Nowak he was known as either Fat Boy or Fat Boy Mike. He provided Nowak with a cell phone number.

When defendant was arrested, he was not initially told the reason for the arrest. He was taken to his home for a parole search, and no one told his family why he had been arrested. He was then taken to the police station's homicide section. About 20 or 25 minutes later, Daniel Mora, an employee at Youth Uprising, called the Oakland Police Department's homicide section and told Nowak that he had video showing that defendant was at work at the time of the incident for which defendant was in custody.

### D. Cell Phone Evidence

The custodian of records of defendant's cell phone provider produced and testified about his cell phone records. The subscriber name for the cell phone number defendant had provided to police officers after his arrest was "Fat Mike." The custodian explained that cell phone towers act as antennas, which would pick up a signal when a call was made and send it to the appropriate switch, which would record the call details, including the date and time of the call, its duration, and the tower that picked up the signal. The

---

[6] Harris testified the Corsica was not the car he saw at the shooting.

switch also recorded the "sector," or side of the three-sided tower the call was made from. A call's signal would be picked up by the closest available tower with the strongest signal, which could change during the course of the call if the person using the phone moved.

The cell phone company's records showed that a call was made to the cell phone at 2:22 p.m. on May 25, 2011, approximately the time of the killing, and that its signal was transmitted by a tower and sector that would have picked up signals from the intersection of Ritchie Street and Oliver Street, where the killing took place.

The cell phone records also showed that the day after the killing, defendant received a texted invitation, and defendant responded, "I cant im fonkin plus I gt no banger," which Sergeant Nowak explained meant defendant was in a fight with a rival gang and he had no pistol.

### E. Gang Evidence

Officer Chris Marie of the Oakland Police Department, who was familiar with African-American street gangs in East Oakland, testified as an expert on that topic. He knew Franklin was a member of the Taliban Mafia, a small street gang of 10 to 15 members who loitered in Arroyo Park, near the site of the killing.[7] Marie was also familiar with the Nut Case gang, which had been formed in 2003, and which had a newer subset known as the Case Boys. The Case Boys primarily loitered in the area of 96th Avenue between Peach and Cherry Streets. Another gang, DNI, hung out in the area of 86th, 87th, and 88th Avenues and MacArthur Boulevard. The DNI and Case Boy gangs got along with each other, and were often seen together. In the previous two years, members of the Case Boys had been implicated in murders and shootings, as well as other crimes, and DNI's had also been responsible for shootings and other crimes.

A member of the Case Boys gang, Deadrin Chapman, had been killed in 2010, and the "word on the street" was that members of the Taliban Mafia had been present. Two months later, a member of the Taliban Mafia was murdered. Marie testified that based on

---

[7] Marie testified the killing took place near 79th Avenue and Ritchie, next to Arroyo Park.

information he had gathered from speaking with various informants, it was rumored that the murder of Franklin might be related to the "funk" going on between DNI and the Case Boys on one side and, on the other, the people rumored to have been responsible for the murder of Chapman.

Marie was shown the "Hella Shit" video. He recognized the area in which it was taken as being associated with the DNI gang. Four of the other people in the video were members of the DNI or the Case Boys. He testified that the title of the song, "Hella Shit," referred to numerous crimes being committed. Regarding the meaning of the lyrics, he testified that the reference to "Somebody disrespecting, I'm gonna bounce out and get it, get it," meant that if someone felt he was being disrespected, he would get out of his car and shoot. The lyrics contained the words, "If I'm trippin', trippin', then yeah, it's getting physical. You better play it cool." Marie explained that the reference to getting physical meant that "all possibilities have been exhausted and now violence is going to be involved in resolving the problem." The reference to "knocking them down" referred to shooting any perceived enemy. The word "we" in the phrase "until we the last one standing" would refer to a gang. A reference to "scoping paper" would refer to looking through the scope of a firearm, perhaps at a paper target. The term "jack a playa" referred to robbing someone. Asked about the phrase ".223s hollow drums sound is how them choppers rang," Marie testified that "chopper" is street language for an assault weapon, ".223" referred to the caliber of the round fired from the weapon, and "hollow" referred to "hollow-point ammunition," a kind of ammunition that causes more damage than ordinary ammunition and that was illegal for civilians to carry. Marie testified that people involved in East Oakland gang violence often produced rap videos, and they were normally filmed in an area associated with their gang. In the eyes of people from the streets, "if you rap about committing acts of violence and living a criminal lifestyle, then you are going to live that lifestyle literally"; someone who did not do so would not receive the same respect as someone who did.

9

Marie was shown some of text messages from defendant's phone, and testified that they referred to members of the Case Boy gang and members of a gang with ties to Case Boys gang members.

In Marie's experience, gang members who saw a gang-related killing would ordinarily not want to cooperate with the police. Instead, they would want to "handle it" themselves, meaning retaliate without seeking the help of the police. People who gave police information about criminal act would be labeled "snitches," and risked being killed for it.

Defendant had a tattoo that said, "8600" and "Funk or Die." Marie testified that "8600" probably referred to a particular block in Oakland associated with the DNI gang. The phrase "Funk or Die" had become popular with a subculture that followed violent street-type rap, and signified "the mentality of 'I will not allow anyone to ever disrespect me; and if it means I die, then so be it.' " In the streets of Oakland, the term "funk" meant having a disagreement with someone in a rival gang, or wanting to retaliate against someone after a disagreement or fight.

## F. Defense Case

The defense theory was that defendant was at Youth Uprising at the time of the killing, and someone else, possibly Rondell Hampton, was the true killer. Defendant argued that the white car at the scene of the crime was not a Honda, but rather the Chevy Corsica associated with Hampton, and that the cap Harris had seen was not actually a Cubs cap, but the black and red cap found in the Corsica.

Defendant also presented alibi evidence. Vincent Burton, the facility work force director and manager of security at Youth Uprising, testified that defendant was employed at Youth Uprising, and that he had known defendant for approximately four years. Burton maintained Youth Uprising's video surveillance tapes. He viewed surveillance videos from the day of the killing and identified defendant as being present at 2:17, 2:24, 2:28, 2:33, 2:35, 2:36, 2:37, 2:38, 2:39, 3:07, 3:08, and 3:09 p.m.[8] He

---

[8] The shooting took place shortly after 2:20 p.m.

10

recognized defendant by his clothing, jeans and a gray jacket with black sleeves, and by his posture. However, he appeared less certain of his identifications at the 2:17, 2:35, and 2:37 times than at the 3:08 and 3:09 times. The figures in the surveillance videos for the earlier times were farther away and blurrier than those for the later times.

At defendant's preliminary hearing, Burton had testified that he did not recall seeing defendant at all the day of the killing. At trial, he testified he saw defendant going out the door at 3:30, his "original work time."

Employees at Youth Uprising had to sign in electronically in order to get past the entrance turnstile. Burton did not know of any record of defendant signing in on the day of the killing.

Olugbala Akintunde, who had been the Youth Uprising facilities manager and defendant's former supervisor, identified defendant in surveillance video at 3:08 and 3:09 p.m. on the day of the killing, approaching the turnstile. The picture was taken from the rear, but Akintunde recognized defendant's clothing. He also viewed surveillance pictures and video from the 2:17 through 2:51 timeframe, and said that although they were blurry, defendant appeared to be present in them. At 2:47, defendant appeared to be talking on the phone.

Defendant offered three other alibi witnesses. Isaac Alford testified that he lived across the street from Castlemont High and Youth Uprising and that he spent the day of May 25, 2011 with defendant. That day, defendant was wearing a black T-shirt, blue jeans, and a black and gray coat with leather sleeves and a gray body. He viewed images from surveillance videos taken outside Youth Uprising, and identified defendant in images from 2:17, 2:18, 2:28, 2:33, 2:37, 2:38, 2:39, 2:40, 3:08, and 3:09 p.m. He recognized defendant by his jacket.[9] On cross-examination, Alford testified that he learned he would be an alibi witness for defendant about May 31.

_____

[9] In a written statement made under penalty of perjury, Alford had stated that he and defendant were sitting in front of his apartment building from 1:30 until 3:00 p.m. The surveillance images, however, showed that the person Alford identified as defendant was across the street, outside Youth Uprising, during part of this time. Alford stated in

Defendant's brother M.S.,[10] testified that he went to Alford's house shortly after 1:00 on the afternoon of the shooting. When he was with defendant, Alford, and another friend, Jamal Robbson, M.S. heard shots. He identified defendant in surveillance video images at 2:17, 2:18, 2:33, 2:40, 3:08, 3:09, and 3:23 p.m. Although the images were blurry, he recognized defendant's clothing and shape.

M.S. also testified that he was in the "Hella Shit" video, that the guns on the video were props, and that he did not know defendant to be a member of a gang. When asked about defendant's "8600 Funk or Die" tattoo, M.S. testified that his grandfather, Johnny Heartsman, was a renowned jazz musician and used to say that before playing the piano; it meant "whatever you do, do it to the best of your abilities or don't do it at all." According to M.S., his grandfather "would tell us 'Funk or Die.' " On cross-examination, M.S. acknowledged that he was about two years old when his grandfather died, but testified he had heard recordings of his grandfather making that statement. He also maintained that he could remember his grandfather would "[a]ways say it to me." M.S. acknowledged that the previous week, in a phone call, he had told defendant, "I got your back."

Jamal Robbson testified that he was with M.S. and Alford on the afternoon of the killing, and that he saw defendant across the street from Castlemont High at about 2:00. p.m. Defendant was wearing a letterman's jacket, with black sleeves and a gray body. As they were sitting together, they heard multiple gunshots. Robbson identified defendant in images from the Youth Uprising surveillance videos at between 2:17 and 2:40, and again after 3:00 p.m.

## G. Telephone Conversations from Jail

Akintunde, the Youth Uprising facilities manager, had spoken with defendant about 29 times since defendant's arrest. Audiotapes of two of those calls, which had

---

the declaration that this occurred on June 25, 2011, but testified at trial that he had meant May 25, 2011. He also testified that by the end of May (i.e., within a few days of the shooting), he knew he would have to provide defendant's alibi.

[10] M.S. was 16 years old when he testified.

been recorded, were played for the jury during his cross-examination by the prosecutor. One of them, made on July 8, 2011, two days after defendant's arrest, included the following exchange:

"O [Olugbala Akintunde]: I want you to know that this is back in May before we even had no jobs[.]

"MH [Michael Heartsman]: I know. I know. We was doing landscaping too, though, right?

"O: Yeah, a little bit.

"MH: That's what I'm saying, we was probably gone.

"O: Hey[.]

"MH: Hey, can you look up my time sheet and see what time we started working?

"O: Hey. Hey. I already dealt with all that.

"MH: What. What that say?

"O. That's what I'm. That's what I'm telling you.

"MH: Damn blood.

"O: We gotta work with it from here.

"MH: Alright blood.

"O: Because I did all that. I did all that yesterday, two days ago. You understand what I'm saying?

"MH: Yeah. But what do I do now blood?

"O: You're supposed to be cool. Make sure you deal with your public defender and don't say shit. That's all you gotta do.

"MH: *If they ask me what happened I'm gonna be like I was at work. That's the only thing I got is that I was at work.*

"O: *All you gotta say is you don't know.*

"MH: *Huh?*

"O: *You don't have to be at work to say you don't know. Just. You don't fucking know, Mike. You wasn't, if you wasn't, you wasn't there, then you don't know.*

"MH: *Alright.*

13

"O: You know what I'm saying [Unintelligible]. All they know is some [Unintelligible] prove [Unintelligible] where they were.

"MH: Yeah. Alright.

"O: As long as you don't know, you don't know. You understand?

"MH: Yeah." (Italics added.)

In a call earlier the same day, Akintunde had told defendant, "I don't want you to be on the phone and slip up and say something that might, you know." Defendant replied, "Yeah, I already know," and Akintunde continued: "All this, all this shit is being recorded. I don't want them, you know what I'm saying. They come around. They be calling me in to ask me questions and shit. They already called me."

In addition, while he was in jail during the trial, in phone conversations that were recorded, defendant asked how the jury had reacted to his music video, complained about "snitches," and said he would "send it out" and "[l]et the word be known," which Nowak explained meant letting it be known that someone was cooperating with the police.

## H. Rebuttal

In rebuttal, Officer Marie testified about a YouTube rap video, "Funk or Die." In the video, several young men wear T-shirts bearing the words "Funk or Die," recite those words, and brandish firearms. The video also contains a reference to "bounc[ing] out," as someone gets out of a car with a firearm in his hand. Marie recognized eight people in the video as members of East Oakland gangs that had close ties to the STI gang and the Case Boys. The Case Boys were "somewhat" associated with the STI gang. Defendant's cell phone records showed text messages on May 11 that referred to "STI boys."

At 3:00 p.m. on the day of the killing, defendant's cell phone received a phone call that lasted for approximately 14 minutes, originally transmitted by a cell phone tower approximately 12 to 15 blocks from Youth Uprising; the distance between the cell phone tower and Youth Uprising would take about 25 minutes to walk.[11] However, the person in the Youth Uprising surveillance video who had been identified as defendant had his

_____

[11] The site of the killing was about a 10 minute walk from Youth Uprising.

14

arms to his sides during most of this time and did not appear to be holding a cell phone. Moreover, the surveillance video showed the person wearing the jacket and jeans holding his hand to his ear, as if speaking on a cell phone, between 2:40 and 2:51; however, defendant's cell phone records did not reflect any calls at this time.

## I.   Defendant's Surrebuttal

Defendant's mother testified that she had been in possession of the jacket "the entire time," and that she had thrown away defendant's jeans when she moved.

## II.  DISCUSSION

## A. Ineffective Assistance of Counsel

Defendant contends his counsel rendered ineffective assistance in several ways: by failing to object to inadmissible hearsay and opinion evidence, failing to request a limiting instruction regarding the "Hella Shit" video, failing to seek to suppress Harris's identification of him, and failing to challenge the prosecutor's discriminatory exercise of peremptory challenges.

"Establishing a claim of ineffective assistance of counsel requires the defendant to demonstrate (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient representation prejudiced the defendant, i.e., there is a 'reasonable probability' that, but for counsel's failings, defendant would have obtained a more favorable result." (*People v. Dennis* (1998) 17 Cal.4th 468, 540 (*Dennis*).)  "A court must indulge a strong presumption that counsel's acts were within the wide range of reasonable professional assistance." (*Id*. at p. 541.)  Moreover, tactical errors are generally not reversible. (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1318 (*Jennings*).)  When a defendant makes an effective assistance claim on direct appeal, "the appellate court must look to see if the record contains any explanation for the challenged aspects of representation.  If the record sheds no light on why counsel acted or failed to act in the manner challenged, 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation' [citation], the contention must be rejected." (*People v. Haskett* (1990) 52 Cal.3d 210, 248.)  Thus, "[r]eviewing courts reverse

15

convictions on direct appeal on the ground of incompetence of counsel only if the record on appeal demonstrates there could be no rational tactical purpose for counsel's omissions." (*People v. Lucas* (1995) 12 Cal.4th 415, 442.)

Moreover, "[i]f a defendant has failed to show that the challenged actions of counsel were prejudicial, a reviewing court may reject the claim on that ground without determining whether counsel's performance was deficient." (*People v. Mayfield* (1997) 14 Cal.4th 668, 784.) Prejudice is established when counsel's performance " 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' " (*Ibid*., quoting *Strickland v. Washington* (1984) 466 U.S. 668, 686.) Prejudice must be proved as a " 'demonstrable reality,' not simply speculation as to the effect of the errors or omissions of counsel." (*People v. Williams* (1988) 44 Cal.3d 883, 937.)

With these principles in mind, we consider defendant's claims of ineffective assistance.

### 1. Hearsay

Defendant first argues that defense counsel failed to raise a hearsay objection, and failed to request a limiting instruction, when Nowak testified he had been given a description of the shooter that matched defendant's physical description, that "refused citizens" gave the name of "Nut Case Mike" and said he was affiliated with Youth Uprising, and that anonymous callers identified "L. Dolge" as having been with Franklin the day of the shooting.[12] In closing arguments, the prosecutor relied not only on Harris's direct identification of defendant as the shooter, the cell phone records, and the gang evidence, but also on the description given by a local resident, the anonymous tips, and the fact that there was no evidence that members of the public had identified anyone else as the killer. The prosecutor went on: "[The] most powerful, most important—and if none of the other circumstantial evidence existed, would still be enough to convict the defendant, is Lionel Harris's eyewitness account."

---

[12] Harris testified that his nickname was "L Dose," and Nowak was told L. Dolge's first name was Lionel.

Defendant contends his counsel could have had no tactical reason not to object to the admission of out-of-court statements of the local resident and "refused citizens," and that he was prejudiced by the admission of this evidence. The Attorney General responds that (1) the People were entitled to rebut the defense argument that Nowak had blindly pursued defendant while ignoring evidence that someone else killed Franklin, and (2) defense counsel may have had a tactical purpose in failing to object to the admission of the evidence, to wit, he may have feared that if he had objected to the hearsay evidence, the prosecutor would have persuaded the members of the public who had made the statements to testify at trial and identify defendant as the killer. For his part, as evidence that his counsel lacked such a tactical purpose, defendant points out that during the prosecutor's closing argument, his counsel objected to the prosecutor's reliance on the anonymous tips and the resident's description of the killer, stating: "Objection. . . . None of that evidence was admitted into evidence either, any anonymous callers." The court responded, "No, that's not correct. There was testimony about that from the sergeant." Defense counsel replied, "None that were able to be cross-examined," and the court ruled, "Well, you didn't object, so there was testimony that the jury has now heard. [¶] Overruled."

On this record, we cannot conclude counsel could have had no tactical purpose for failing to object to the hearsay evidence. The strongest evidence against defendant was Harris's eyewitness identification; to counter that, defense counsel argued that Harris was not actually at the scene at the time of the murder, but rather had heard rumors about what had happened. The existence of the anonymous tips might be seen as supporting a theory that Harris's identification of defendant as the shooter was the result of hearing those rumors rather than actually seeing the shooting.[13] The rumors could also provide an innocent explanation for how Alford knew within a few days of the shooting—well before defendant was arrested—that he would need to provide an alibi for defendant.

---

[13] When the prosecutor argued in his rebuttal that there had been no explanation as to why anonymous tips and rumors and a local resident all implicated defendant, he appeared to be responding to this argument.

17

In any case, whether or not defense counsel had a tactical purpose, defendant has not met his burden to show prejudice.  The neighbor's description of the killer as a heavyset Black male was not specific, and could have matched the description of any number of people—including Rondell Hampton, as defense counsel pointed out.  As to the anonymous tips, they were at most a minor part of the case against defendant, of which the prosecutor argued the "most powerful, most important" part was the eyewitness testimony of Harris, who was familiar with defendant before the killing, recognized him, and identified him by name before being shown his picture in the photographic lineup.  Moreover, defendant's presence at the scene of the crime was supported by the cell phone evidence, and his alibi was called into question by the recorded phone call from jail in which he and Akintunde discussed whether or not he should say he was at work at the time of the shooting.   Accordingly, we see no " 'reasonable probability' that, but for counsel's failings, defendant would have obtained a more favorable result."  (*Dennis*, *supra*, 17 Cal.4th at p. 540.)

### 2.  Opinion Evidence

Defendant contends his counsel was ineffective in failing to object to certain improper opinion evidence:  Nowak's testimony that it was common for people to confuse Toyotas with Hondas; Nowak's testimony that he ruled out the white Corsica later impounded as the one at the scene of the crime because American-made cars were generally bigger than Japanese cars; his testimony that he did not find the color of the red and black baseball cap found in the Corsica significant because red and black baseball caps are common in Oakland, Harris had identified the cap he saw as a Cubs cap, and "one thing [the young men in East Oakland and West Oakland] know is sports, and they don't mistake teams";[14] Nowak's testimony that the details Harris provided persuaded him that Harris was present at the time of the killing; and his testimony that he ruled out Kennedy, Hampton, and Smith as suspects based on Harris's statements.  Defendant also contends defense counsel was ineffective in failing to object when the prosecutor relied

---

[14] Defense counsel interposed an objection to the testimony that young men in East Oakland "know a lot more about sports than" Nowak, which was overruled.

on some of this evidence during closing argument.  According to defendant, this testimony was improper opinion evidence because it was irrelevant to the question of the identity of the killer, opinion testimony on a witness's veracity is improper, and the testimony addressed subjects of common knowledge that are not appropriate for opinion testimony.  (See *People v. Brady* (2010) 50 Cal.4th 547, 558 ["Only relevant evidence is admissible"]; *People v. Fuiava* (2012) 53 Cal.4th 622, 672 [expert opinion testimony limited to subject sufficiently beyond common experience that expert opinion would assist trier of fact]; see also *People v. Riggs* (2008) 44 Cal.4th 248, 300 [noting uncertainty regarding continuing viability of rule that opinion testimony about veracity of another witness's statements is inadmissible].)  This testimony, defendant argues, was prejudicial because it bolstered Harris's testimony that he was present at the scene of the crime, his description of the vehicle, and his testimony that the Corsica was not the car he saw at the scene of the crime.

Once again, we find defendant has not met his burden to show prejudice.  The conclusion that Harris was present at the scene of the crime and that the car in question was a Honda and not a Corsica did not rely primarily on Nowak's testimony.  Harris himself testified at trial, and his presence at the scene is corroborated by the video that shows him asking  about the bike after the shooting.  Moreover, the jury had before it pictures of the impounded white Corsica.[15]  There is no basis to conclude the jury gave improper weight to Nowak's opinion about the sports knowledge of residents of East Oakland or his testimony that Harris's knowledge of details of the crime scene had persuaded him that Harris was actually present.

3.  *Video Evidence*

Over defendant's objection, the jury viewed the "Hella Shit" video.  In argument before the trial court regarding the admissibility of the video, the prosecutor took the position that the video—in conjunction with Officer Marie's testimony that several people in the video were members of the Nut Case gang, which had an ongoing feud with

---

[15] It is hard to see how Nowak's opinion that people commonly confuse Toyotas and Hondas could have prejudiced defendant.

the Taliban Mafia—would show that defendant had a motive to kill Franklin and would corroborate Harris's testimony that he knew defendant as a member of the Nut Case gang. (See *People v. Zepeda* (2008) 167 Cal.App.4th 25, 32–35 (*Zepeda*) [songs showing motive and intent of defendant's gang to kill rival gang members properly admitted]; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1373 (*Olguin*) [rap lyrics tending to show defendant's gang membership relevant where crime was gang-related].) The trial court suggested it might be appropriate to instruct the jury that the video was offered simply on the question of motive and that it was not to use the video as evidence that defendant was a person of bad character. Defense counsel indicated that if the video was admitted, he would like a limiting instruction, and the court stated that they could work on the phraseology of an instruction. When the jury viewed the video, however, no limiting instruction was provided, and defense counsel did not renew his request for such an instruction. Marie then testified about the meaning of some of the lyrics; for instance, according to Marie, "Somebody disrespecting, I'm gonna bounce out and get it, get it," meant that the person would conduct a drive-by shooting.[16] He also testified without objection that East Oakland gang members would make rap videos to "glorify and promote" their lifestyle and that "if you rap about committing acts of violence and living a criminal lifestyle, then you are going to live that lifestyle literally" or not be seen as a credible rapper.

When the jury heard the "Funk or Die" video, which did not include defendant as a participant, defense counsel did not request a limiting instruction.

Defendant contends his counsel was ineffective in failing to seek a limiting instruction, without which, he argues, the jury would have treated the videos as impermissible propensity evidence. The Attorney General suggests defense counsel may have chosen as a matter of tactics not to request such an instruction, based on a belief that

---

[16] Defendant objected to this portion of Marie's testimony on the grounds of hearsay and no personal knowledge; the trial court overruled the objection. Marie testified about the meaning of other portions of the video without objection.

20

it would unduly highlight the videos without assisting the defense. (See *People v. Hernandez* (2004) 33 Cal.4th 1040, 1053 [counsel may have chosen not to request limiting instruction to avoid highlighting the purpose for which evidence *could* legitimately be used].) Whether or not counsel had the tactical purpose of avoiding an instruction to the jury that it could consider the videos to determine whether defendant had a motive to kill Franklin, we conclude defendant has not met his burden to show prejudice. The jury was instructed that it must find defendant guilty beyond a reasonable doubt and that the arguments of counsel were not evidence (see *Jennings*, *supra*, 81 Cal.App.4th at p. 1318), and there is no reason to conclude the jury concluded from the video that defendant had the propensity to commit drive-by shootings and therefore that he killed Franklin.[17]

### 4. *Photographic Identification*

Defendant contends his counsel was ineffective in failing to seek to suppress Harris's photographic identification of him, which defendant contends was obtained through an inherently suggestive procedure.

During his interview with the police, Harris was shown a "six-pack" of photographs, and identified the photograph of defendant as the shooter. The photographs all showed young men with facial hair and somewhat heavy builds, who appeared to be African-American; the head in the picture of defendant, however, filled up more of the frame than those of the others in the photographic lineup. Defendant contends this identification procedure was inherently suggestive, and his trial counsel should have sought to suppress it. We reject this contention.

" 'In order to determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedures was unduly suggestive and unnecessary, and, if so, (2) whether the

---

[17] We likewise reject defendant's contention that the cumulative effect of his counsel's failings was prejudicial. We see no likelihood that defendant would have reached a more favorable result if his counsel had acted differently as to the hearsay, opinion evidence, and videos.

identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification. [Citations.]' [Citation.] [¶] '[D]efendant has the burden of showing that the identification procedure was unduly suggestive and unfair "as a demonstrable reality, not just speculation." [Citation.] A due process violation occurs only if the identification procedure is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." [Citation.] [¶] . . . [A]n identification procedure is considered suggestive if it "caused defendant to 'stand out' from the others in a way that would suggest the witness should select him." [Citation.]' " (*People v. Johnson* (2010) 183 Cal.App.4th 253, 271–272 (*Johnson*).)

Bearing these factors in mind, we have no difficulty in concluding a motion to suppress the identification would have had little chance of success. Although defendant's image in the photographic lineup is larger than those of the others, this difference did not cause this picture to "stand out" in a way that suggests Harris should select him. The individuals appeared similar in race, age, facial hair, and body type. It is unlikely the trial court would have found the lineup unduly suggestive. (Cf. *People v. Nation* (1980) 26 Cal.3d 169, 174, 178–180 [impermissibly suggestive identification procedure when three witnesses viewed photographs together and agreed defendant was suspect; photograph then brought home to another witness who agreed it showed suspect].) In any case, there were factors rendering the identification " 'reliable under the totality of the circumstances.' " (*Johnson*, *supra*, 183 Cal.App.4th at p. 271.) Harris was familiar with defendant before the shooting, he identified him by name before being shown the photographs, and he stated that the person in the picture did the shooting "[w]ithout a doubt." In the circumstances, a motion to suppress the identification would have lacked merit, and we discern neither incompetence nor prejudice in counsel's failure to make one.

*5. Jury Selection*

Defendant contends his counsel was ineffective in failing to make a *Wheeler*/*Batson* motion (*People v. Wheeler* (1978) 22 Cal.3d 258 and *Batson v. Kentucky* (1986) 476 U.S. 79) challenging the prosecutor's use of peremptory challenges to strike male and African-American prospective jurors.  "A prosecutor's use of peremptory challenges to strike prospective jurors on the basis of group bias—that is, bias against 'members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds'—violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution.  [Citations.]  Such a practice also violates the defendant's right to equal protection under the Fourteenth Amendment to the United States Constitution."  (*People v. Avila* (2006) 38 Cal.4th 491, 541.)  In challenging peremptory strikes, " '[f]irst, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose."  [Citations.]  Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes.  [Citations.]  Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination."  [Citation.]' "  (*Ibid.*)  Such challenges are also appropriately made when a prosecutor strikes jurors based on gender.  (*J.E.B. v. Alabama ex rel. T.B.* (1994) 511 U.S. 127, 129, 146.)

Of the 17 peremptory challenges he exercised in the selection of regular and alternate jurors, the prosecutor challenged 13 men and four women.  Of those, his first eight challenges were to men.  Two of the women challenged were African-American.  The jury empanelled included eight women and four men.  No members of the jury were African-American.  The alternate jurors were two men and one woman, none of them African-American.   Defendant contends his counsel was ineffective in failing to raise a *Wheeler*/*Batson* challenge.

23

We quote the language of our Supreme Court in rejecting a similar contention: "On this record, we are unable to determine the reason counsel did not make a timely challenge. He may have perceived the prosecutor could adequately rebut the charge, or he himself may have been dissatisfied with the individuals excused. Since the decision may well have been 'an informed tactical choice within the range of reasonable competence, the conviction must be affirmed. [Citation.]' " (*People v. Bolin* (1998) 18 Cal.4th 297, 317.) We reach the same conclusion here. As stated in *People v. Jackson* (1989) 49 Cal.3d 1170, 1202: "Insofar as establishing that trial counsel was ineffective for failing to object on *Wheeler* grounds [citation], the record does not affirmatively reveal that counsel had no rational tactical purpose for failing to object."

We also note that the jury selected included four men, which suggests the prosecutor was willing to have men serve on the jury (see *People v. Ward* (2005) 36 Cal.4th 186, 203 [fact that jury included members allegedly discriminated against is indication of good faith in exercising peremptories]), and there is nothing in the facts of this case to suggest that men and women would be likely to view the case differently. As to the two African-Americans the prosecutor challenged, one of them had been convicted of "wet []reckless" and had a brother who had spent approximately 13 years in the penal system, and the other reported that her half-sister's mother was in prison for life for murder and that her sister and husband lived on Ritchie Street, the same street where the crime took place. (See *Wheeler*, *supra*, 22 Cal.3d at p. 277, fn. 18 [criminal conviction and incarceration suffered by either juror or close relative often deemed to give rise to significant potential for bias against prosecution]; see also *People v. Douglas* (1995) 36 Cal.App.4th 1681, 1690.) On this record, there is no basis to conclude defense counsel acted outside the wide range of professional competence in failing to bring a *Wheeler*/*Batson* motion.

## B. Admissibility of Rap Video

As we have explained, defendant has contended on appeal that his counsel was ineffective for failing to obtain an instruction limiting the purposes for which the jury

could consider the "Hella Shit" video. In supplemental briefing, he expands that argument to contend that the rap video should not have been admitted for any purpose.

For this latter contention, defendant relies on a case recently decided by the New Jersey Supreme Court, *State v. Skinner* (2014) 218 N.J. 496 (*Skinner*). In *Skinner*, the court concluded that violent and profane rap lyrics written by the defendant had been improperly admitted because they were highly prejudicial and bore little or no probative value as to his motive or intent in the charged attempted murder. (*Id.* at pp. 499–500.) The court held that such forms of self-expression about bad acts, wrongful acts, or crimes were inadmissible "unless the writing reveals a strong nexus between the specific details of the artistic composition and the circumstances of the underlying offense for which a person is charged, and the probative value of that evidence outweighs its apparent prejudicial impact." (*Ibid.*) In carrying out its analysis, the court applied a four-part test used in New Jersey to determine the admissibility of evidence of prior crimes or wrongful acts: the evidence of the other crime must be relevant to a material issue, it must be similar in kind and close in time to the offense charged, it must be clear and convincing, and the probative value must not be outweighed by the prejudice. (*Id.* at pp. 514–516, citing *State v. Cofield* (1992) 127 N.J. 328, 338.) Defendant urges us to apply the *Skinner* test to the admissibility of the rap video. Specifically, he argues that the video constitutes inadmissible propensity evidence and that it should have been excluded because it does not meet the standards of Evidence Code section 1101, which governs the admissibility of evidence of prior misdeeds.[18]

We are not persuaded. We are, of course, not bound by the decisions of the courts of another state. (*Amerigraphics, Inc. v. Mercury Casualty Co.* (2010) 182 Cal.App.4th 1538, 1553.) In California, "[c]ase law holds that where evidence of gang activity or

---

[18] Evidence Code section 1101 provides that, in general, evidence of a person's character, including evidence of specific instances of his or her conduct, is inadmissible to prove his or her conduct on a particular occasion. (Evid. Code, § 1101, subd. (a).) However, evidence that a person committed a crime, civil wrong, or other act may be admissible to prove some fact other than propensity, including motive, or intent. (Evid. Code, § 1101, subd. (b).)

membership is important to the motive, it can be introduced even if prejudicial." (*People v. Martin* (1994) 23 Cal.App.4th 76, 81.) And at least two California courts have upheld the use of rap lyrics in circumstances similar to those before us now. In *Zepeda*, *supra*, 167 Cal.App.4th 25, the jury heard two tracks from a "gangster rap" CD that the defendant had written, which contained violent and profane lyrics. (*Id.* at pp. 32–34.) On appeal, he contended the evidence was cumulative, that the lyrics added nothing to the question of his gang membership, the gang's violent character, and its animosity toward a rival gang, and that the evidence was unduly prejudicial. (*Id.* at p. 34.) The Court of Appeal disagreed, concluding the trial court did not abuse its discretion in determining the tracks were not unduly prejudicial under Evidence Code section 352: The evidence was probative of his state of mind and criminal intent, as well as his gang membership and loyalty. Although anticipatory, the evidence was relevant to the murder charges against the defendant. (*Zepeda*, at p. 35.) Moreover, it provided noncumulative evidence of his state of mind and gang associations. (*Ibid.*) Similarly, in *Olguin*, *supra*, 31 Cal.App.4th at pages 1372–1373, the appellate court concluded the trial court did not abuse its discretion in admitting rap lyrics that tended to show the defendant's gang membership, his loyalty to the gang, his familiarity with gang culture, and, by inference, his motive and intent.

We agree with the reasoning of *Olguin* and *Zepeda*. The prosecution's theory was that the shootings were gang-related. The "Hella Shit" video, in conjunction with the testimony of Officer Marie, provided evidence that defendant was associated with the DNI or Case Boys gang, which was apparently involved in an ongoing dispute with the gang of which Franklin was a member, that he was loyal to the gang, that he was familiar with the gang's culture of violence, and that he had a motive to shoot Franklin and Harris. We have reviewed the video, and conclude the trial court did not abuse its discretion in concluding its probative value outweighed its prejudicial effect.

26

## C. Conflict of Interest

Defendant contends his trial counsel, Gregory Martin, became a material witness to the alibi defense, and that this created an impermissible conflict of interest that compromised Martin's ability to represent defendant's interests.

### 1. Background

Vincent Burton of Youth Uprising identified defendant on the surveillance tapes at 2:17, 2:24, 2:28, 2:33, 2:35, 2:36, 2:37, 2:38, 2:39, 3:07, 3:08, and 3:09 p.m. on the day of the killing. However, during cross-examination, he admitted that at the preliminary examination, he did not identify defendant on the videotape at any time before 3:08. According to Burton, he did not view the earlier portions of the tapes before the preliminary hearing, and only looked at the earlier times a week and a half or two weeks before he testified at trial; at that time he looked at the tapes "[j]ust to see if I saw anything that was different from what they were asking for and was he present at that time." This testimony took place on a Thursday; the trial recessed for the weekend before the prosecutor completed his cross-examination.

The following Monday, before cross-examination of Burton resumed, the defense called Samantha Odom, a counselor at Castlemont High, who testified that Franklin was not in his third period class the day of the killing. On cross-examination, she testified that the previous Thursday (the same day Burton testified), as she was waiting to testify, defense counsel came into the waiting room and said something like, "It's all on videotape. It's all on videotape."

Cross-examination of Burton then resumed. Burton testified that in the two weeks before he testified at trial, he had been in touch with an inspector from the District Attorney's office who told him he might be a witness at trial. After that, Burton reviewed the security video. He testified that he did not tell anyone, including defendant's attorney, that he had seen defendant on the video in the 2:17 time frame; the first time he told anyone that was when he testified at trial. When asked, "And it was just a

27

coincidence that Mr. Martin happened to know to queue up the video at 2:17; is that what you're telling us?" he replied, "I'd say yeah."[19]

Isaac Alford, who testified at trial that defendant was with him at the time of the killing, had prepared a declaration stating that defendant had been with him on "June 25, 2011" from approximately 1:30 until 3:00 p.m. The declaration was dated July 24, 2011. Alford testified that he had spoken with defense counsel, who asked him to write a statement about what had happened. Alford testified that the declaration misstated the date on which defendant was with him, and that rather than June 25, 2011, he had meant to write May 25, 2011. On cross-examination, the prosecutor asked: "Did Mr. Martin give you the information to write down?" Alford replied, "No." The prosecutor asked, "So you wrote it down June 25?" and Alford answered, "Yes."[20]

The prosecutor also asked Alford when he learned he would be an alibi witness for defendant, and he replied, "probably like May 31st, something like that." Asked, "[a]nd you understand the defendant was arrested on July 6th, right?" Alford replied, "Yes."

During redirect examination, Alford testified that he had not been prepared for his testimony and had not seen any of the video surveillance tape before he testified.

In his closing and rebuttal arguments, the prosecutor characterized the alibi defense as based on "false alibis and contrived testimony. He pointed out that "at the end of May, Isaac Alford is asked by the defendant to be an alibi," and argued that the fact that Alford knew, weeks before defendant's arrest, that he was going to provide an alibi indicated "[t]hat's where the deceit starts."

----

[19] On direct examination, defense counsel had shown Burton portions of the surveillance tapes at various times, including 2:17 p.m.

[20] Both defendant and the Attorney General read this testimony to mean that Alford prepared his declaration at defense counsel's request on June 25, 2011—that is, two weeks before defendant was arrested. We read it differently. Taking the testimony in context, it appears to us that the prosecutor was asking Alford whether he wrote June 25 as the date on which he spent the afternoon with defendant. The declaration states that it was executed on July 24, 2011, two and a half weeks after defendant's arrest, and nothing in counsel's questioning of Alford appeared designed to call that date into question, or to suggest that defendant had retained counsel before his arrest.

28

In discussing the Youth Uprising surveillance video, the prosecutor argued: "We go through the video; other heavyset individuals, other individuals going in and out of Youth Uprising. The only person Vincent Burton identifies in court for you is the defendant. [¶] He says that the first time he watched the phony defendant—" whereupon defense counsel interposed an objection: "Objection. Yes, yes, Mr. Martin knew where and when to cue up the phony defendant? He's coming at me personally." The trial court overruled the objection, and the prosecutor continued, "Mr. Burton said that the first time he watched the phony defendant was in court. Yes, Mr. Martin, the defendant's attorney, was able to go right to 2:22, and Mr. Burton was able to go right to the screen and point out who he believe[d] was the defendant. That is very, very suspicious."

In the course of discussing Alford's testimony, the prosecutor argued, "Isaac Alford said he spoke to the defendant around 1:00 and 3:p.m. [*Sic.*] Remember, Mr. Martin had Mr. Alford come down, brought him up to the screen so he could look at phone records. Isaac Alford recalled a phone call that went back and forth where the defendant[] said[,] 'Yeah, I'm coming over.' [¶] 'Well did you talk to him back?' [¶] Yeah. I told him to come over.' [¶] Well, look at the two phones calls that are pointed out on direct examination by the defense, and you see both of them are marked 'Not answered'; 'not answered.' " The prosecutor argued Alford "would say anything to get his friend off because he's part of this manufactured alibi."

Later, the prosecutor argued, "It started with Isaac Alford, and it played out in court with multiple witnesses willing to stretch the truth or outright lie to you about where the defendant was. [¶] So when did you realize the defense was told [*sic*] malarkey? Was it when the witness just came forward? No electronic record was produced? Learning that Alford Isaac [*sic*] became the alibi in May? Was it the 'funk or die' being told to a two-year-old? When Daniel Mora from Youth Uprising called OPD Homicide? The defendant referring to the jacket as 'them clothes?' [¶] All of those witnesses, all of that malarkey, doesn't really matter though because the defense has tried to sell you a ticket on the Titanic."

## 2. *Analysis*

Defendant contends that the testimony of Burton and Odom raised questions that only defense counsel could answer, namely "when, where and how did counsel discover that defendant was depicted in the Youth Uprising surveillance footage for 2:15 p.m. and subsequent 2:00 p.m.-related time periods[?]" According to defendant, his counsel's testimony would have been necessary to explain whether he made the comment to Odom ("It's all on videotape") before or after Burton testified; otherwise, defendant contends, the jury would have been free to speculate that counsel made the comment to Odom before Burton testified. This, defendant contends, could support the theory that Burton had previously told counsel he had seen defendant on the video at 2:17 p.m., and that his trial testimony to the contrary was false. Defendant also contends his counsel's testimony was necessary to corroborate Alford's testimony that he had not been prepared for his testimony about the surveillance video, and to counter a suggestion that defendant retained counsel before his July 6, 2011, arrest and that his defense counsel was responsible for fostering a false alibi. According to defendant, his counsel had the duty either to obtain his client's waiver of his right to conflict-free counsel or withdraw from the case.

The constitutional right to assistance of counsel "includes the correlative right to representation free from any conflict of interest that undermines counsel's loyalty to his or her client. . . . 'As a general proposition, such conflicts "embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or his own interests. [Citation.]' " (*People v. Doolin* (2009) 45 Cal.4th 390, 417.) A claim of a conflict of interest "is one variety of claim that counsel provided ineffective assistance. Hence, to obtain reversal of a criminal verdict, the defendant must demonstrate that (1) counsel labored under an actual conflict of interest that adversely affected counsel's performance, and (2) absent counsel's deficiencies arising from the conflict, it is reasonably probable the result of the proceeding would have been different. [Citations.] [¶] When addressing an appellate claim that a conflict of interest adversely affected counsel's performance, the reviewing

court is ' "bound by the record. But where a conflict of interest causes an attorney not to do something, the record may not reflect such an omission. We must therefore examine the record to determine (i) whether arguments or actions omitted would likely have been made by counsel who did not have a conflict of interest, and (ii) whether there may have been a tactical reason (other than the asserted conflict of interest) that might have caused any such omission." [Citation.]' " (*People v. Mai* (2013) 57 Cal.4th 986, 1009–1010.) As defendant points out, a conflict of interest may arise when counsel becomes a witness in a case. (See, e.g., *People v. Rodriguez* (1981) 115 Cal.App.3d 1018, 1021–1022 [defense counsel required to testify as witness for prosecution]; see also *People v. Donaldson* (2001) 93 Cal.App.4th 916, 919 [defense counsel rendered ineffective assistance in failing to object when prosecutor took stand to impeach witness's exculpatory testimony and expressed her belief in argument as to defendant's guilt]; but see *People v. Marquez* (1992) 1 Cal.4th 553, 574 [distinguishing *People v. Rodriguez* and concluding trial court did not err in allowing defense counsel to testify on defendant's behalf] and *People v. Goldstein* (1982) 130 Cal.App.3d 1024, 1031 [distinguishing actual or potential conflict of interest between attorney and client from case of "attorney who, without fault or purpose on his part, after a trial's commencement found it to be in his client's interest that he testify on the client's behalf"].)

We are not persuaded that defense counsel's actions meet these standards. We find no basis to conclude the jury would have been likely to believe either that defense counsel showed the surveillance videotape to Burton or Alford in advance—contrary to their trial testimony—or that the jury was likely to have reached a different conclusion if it had heard counsel's testimony that he had not done so. Thus, there was neither an actual conflict nor a reasonable probability of a different result if counsel had acted differently.

As to defendant's claim that his counsel's testimony was necessary to counter a suggestion that he had been retained *before* defendant's arrest, this appears to be based on a misunderstanding of the record. Defendant relies on Alford's affirmative answer to the question about the content of his declaration: "So you wrote it down June 25?" As we

31

have explained, while the wording of the question, taken in isolation, is ambiguous, in context it appears clearly to refer to the *content* of the declaration, not the date on which it was executed:  that is, the prosecutor was asking Alford if he had written in his declaration that he had spent the afternoon of June 25 with defendant, not whether he had executed his declaration on June 25.  (*Ante*, fn. 20.)  The declaration itself is clear that it was written on July 24, 2011.

## D. Prosecutorial Misconduct

Defendant contends the prosecutor committed misconduct in a number of ways and that his counsel was ineffective for failing to raise objections to the misconduct.  "A prosecutor's conduct violates the federal Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.'  [Citations.]  'Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under [California] law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.' " (*People v. Young* (2005) 34 Cal.4th 1149, 1184 (*Young*).)  "When a claim of misconduct is based on the prosecutor's comments before the jury, ' "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' " (*People v. Friend*  (2009) 47 Cal.4th 1, 29.)  We do not " ' "lightly infer" ' " that the jury drew the most damaging meaning from a prosecutor's statements.  (*People v. Brown* (2003) 31 Cal.4th 518, 553–554.)

"In general, ' " 'a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant [requested] an assignment of misconduct and [also] requested that the jury be admonished to disregard the impropriety.' " ' " (*Young*, *supra*, 34 Cal.4th at pp. 1184–1185.)  This rule does not apply if an objection or request for admonition would have been futile or would not have cured the harm caused by the prosecutor's misconduct.  (*People v. McDermott* (2002) 28 Cal.4th 946, 1002.)  We may also consider claims of ineffective assistance of counsel for failure to object at trial to prosecutorial misconduct.  (*People v. Lewis* (1990) 50 Cal.3d 262, 282.)

32

Defendant did not object to any of the asserted misconduct of which he now complains. However, as we discuss below, we find no merit in any of defendant's claims of misconduct; we accordingly reject his claim that his counsel was ineffective in failing to raise the issue below or failing to request that the jury be admonished to disregard the impropriety.

### 1. *Colors of Cap*

As one of his claims of misconduct, defendant points to arguments made by defense counsel and the prosecutor about the color of the baseball cap Harris testified the killer's companion was wearing. As we have explained, Harris testified the companion was wearing a red and black baseball cap with a "C" on it, for the Cubs. During his closing argument, defense counsel stated that the Cubs' colors were blue and red, not black and red, noted that the cap found in the Corsica—apparently a Detroit Red Wings cap—was black and red, and went on: "But once again, I've never known the Cubs to be anything other than blue and red. [¶] I'm sure you can get anything—any color you want. You could go to any 'Caps R Us' and get a cap printed up with a knock-off cap of any color, but the official colors are blue and red." The prosecutor objected on the ground that defense counsel was testifying, and the trial court sustained the objection, noting there was no evidence of what the Cubs' colors were. In his rebuttal argument, the prosecutor argued that Harris would not have mistaken a Red Wings cap for a Cubs cap, noted defendant's argument that the Cubs wore red and blue, pointed out that in the "Funk or Die" video, someone was wearing a red-and-black A's hat, and went on, "I'm not going to tell you what the official colors of the A's are, but I think it's clear what you've seen in these videos: There are a number of different colored hats, and Sergeant Nowak's testimony, which was uncontradicted, was 'These kids, some of them don't have much of an education; but man, one thing they know are their sports teams.' "

This argument, defendant contends, was improper because the trial court had already prevented defense counsel from testifying about the official colors of sports teams' caps. We see no impropriety. In effect, the prosecutor agreed with the point defense counsel had tried to make (that the official colors of the Cubs were blue and red)

33

and agreed with defense counsel's statement that caps might nevertheless be made in different colors. This argument was not the sort of "deceptive or reprehensible method[] to attempt to persuade either the trial court or the jury" (*Young*, *supra*, 34 Cal.4th at p. 1184) that constitutes reversible misconduct.

### 2. *Photograph on Alford's Cell Phone*

At trial, Alford testified that he had on his cell phone a picture of defendant wearing a letterman's jacket. The court noted that defense counsel appeared surprised by the testimony. Later that day, Alford testified that he had emailed the picture to the court. He was shown the picture, and testified that in it defendant was wearing the same jacket as was seen in the Youth Uprising surveillance video on the day of the killing. On cross-examination, Alford testified that the picture was taken in 2011, but that he did not know what month.

In his closing argument, defense counsel reminded the jury of Alford's testimony and stated, "The defendant was arrested on July the 6th. Clearly, I would surmise, the evidence would be just logical; inference could be made that if he's arrested on July the 6th, clearly that picture of him in the jacket would have had to have been taken prior to his arrest. [¶] Well, at break from the jury, he emailed a picture—" The prosecutor objected on the ground that counsel was testifying. The court asked, "Did you present evidence of that?" and counsel stated, "Okay. Moving on." The court told counsel, "You know you can't just do that. You can't just keep that up. You can't just keep saying things, and when you get called on it, you say 'I'll move on.' You have to discuss the evidence in the box I told the jury about on Day One. That is the evidence that was presented in court, not stuff that you just want them to hear now that it's too late." Counsel replied, "Okay. They know my testimony is not evidence, so. Okay. [¶] [M.S.]—the picture was entered into evidence. You saw the picture of the defendant in the jacket subsequent to Mr. Alford being on that stand. And that picture was admitted into evidence, and Mr. Alford identified the defendant again in that picture on the stand."

Defendant points out that there was evidence that Alford had emailed the photograph to the court, and argues that as a result of the prosecutor's objection and the

34

trial court's "tirade," the jury could have refused to consider the photograph and could have considered it part of defendant's "phony alibi." We disagree. In the first place, it is not clear from the context whether the prosecutor's objection was to defense counsel's statement that the picture would have had to be taken before his arrest in early July or to his statement that Alford emailed a picture during a break from the jury's presence. In any case, even assuming the jury understood the objection to be to the statement that Alford emailed the picture, we find neither misconduct nor prejudice. The jury heard testimony that the picture was of defendant in the jacket worn in the surveillance video, the picture was received into evidence, and counsel was able to argue that it showed defendant in the same jacket as the person in the surveillance video.

### 3. *"Phony Alibi"*

The prosecutor argued that defendant had presented a false alibi. Defendant contends some of this argument constituted misconduct.

At trial, Sergeant Nowak testified that when defendant was arrested, he was not told the reason for the arrest. About an hour and a half after the arrest, Daniel Mora of Youth Uprising called Nowak and told him that he had a video showing defendant was at work at the time of the incident for which he was in custody. Defense counsel objected on the ground of hearsay when the prosecutor asked, "Why did Mr. Mora call?" The prosecutor stated, "Goes to the effect on the hearer, not offered for the truth," and the trial court overruled the objection, instructing the jury that "the content of the statement is not being offered for its truth, but the fact of whether the statement was made or not is a subject for your consideration."

In his closing argument, while arguing that defendant's alibi was false, the prosecutor mentioned the phone call and said Nowak had thought it was suspicious that Mora would make that phone call, since no one had been told why defendant was being arrested. Defense counsel interposed, "Objection. Now what did I object to? Daniel Mora, when Sergeant Nowak was testifying about—" The court stated, "I don't believe you did. [¶] Overruled." Defendant contends this ruling was wrong; according to defendant, the testimony about the phone call was admitted only to show its effect on

35

Nowak, and the prosecutor improperly argued that its content showed the alibi was false. This contention has no merit. The trial court instructed the jury it could consider whether Mora made or did not make the statements in the phone call, and the prosecutor could properly rely on the fact that Mora made the call in order to argue that defendant's alibi was contrived.

Defendant also contends the prosecutor improperly suggested his counsel was part of manufacturing the false alibi. For this, he relies on the prosecutor's statement in his closing argument that in his opening statement, defense counsel had not mentioned defendant was on the surveillance video near the time of the murder. Once again, this contention has no merit. The prosecutor's statement was correct: Although defense counsel had promised in his opening statement to show defendant was not present at the crime scene and that it was impossible for him to have committed the shootings, he did not tell the jury defendant was shown on the Youth Uprising video at the time in question. In any case, nothing in the prosecutor's statement suggested defense counsel had knowingly presented a false alibi. Nor are we persuaded that the jury would have understood that the prosecutor's use of the term "phony defendant" (to describe the person shown in the video at the relevant times) meant that defense counsel was complicit in suborning perjury.

Finally, we reject defendant's suggestion that the prosecutor implicated defense counsel in the false alibi by stating that defense counsel procured alibi witness Alford to "come down" and testify. The prosecutor's statement was as follows: "Isaac Alford said he spoke to the defendant around 1:00 and 3:p.m. [*Sic.*] Remember, Mr. Martin had Mr. Alford come down, brought him up to the screen so he could look at phone records." The words "come down" in context appear to refer not to defense counsel calling Alford as a witness, but him asking Alford to leave the witness stand to look at phone records on a screen.[21] In any case, even assuming defendant's interpretation is correct, we would see

---

[21] When he was being questioned about defendant's phone records, Alford said he could not see the records on the monitor, and defense counsel told him, "Oh, you're welcome to come down."

no impropriety or prejudice in the prosecutor making the observation that defense counsel summoned defendant's own witnesses to the courthouse.

Finally, we reject defendant's contention that the prosecutor committed misconduct in relying on the "Hella Shit" and "Funk or Die" rap videos in his closing argument. The argument was a fair discussion of the evidence presented at trial.

In the absence of any prosecutorial misconduct, we reject defendant's claim that his counsel was ineffective in failing to request a jury admonition.

## E. Judicial Misconduct

Defendant contends the trial court exhibited bias in favor of the prosecution and against the defense, and as a result he was deprived of a fair trial. For example, defendant points out, the trial court sustained a number of prosecution objections to testimony or argument offered by defendant, and at times on its own motion noted that defendant was seeking to elicit inadmissible hearsay, but the court did not similarly prevent the prosecution from eliciting hearsay on its own motion; the court on occasion questioned witnesses or clarified their answers; the court admonished defense counsel when he disobeyed a ruling prohibiting the parties from questioning Harris about the reason he was no longer a student at Castlemont High School; the court indicated defense counsel should frame his questions in a way that would be intelligible when the transcript was read later; the court on occasion asked defense counsel to draw extensive or repetitious questioning to a close, suggested questions defense counsel should ask, or clarified his questions; the court explained in words the gesture Harris made to explain how Franklin looked as he lay on the ground after being shot; the court explained to Harris that the term "the decedent" referred to Franklin; the court said, "Oh, no, no, no. [¶] My limited patience is at a low end, folks," when, the record showed, defendant "grab[bed]" a pointer his counsel had handed to him; the court told defense counsel not to testify; the court told defense counsel he was not running a "comedy club" and told him he had no patience for jokes when defense counsel—in questioning Marie about the meaning of the term "funk"—began a question: "My wife said I was funky"; and the

37

court did not prevent the prosecutor from arguing that the defense had presented a false alibi and tried to trick the jury with "malarkey."

"A trial court commits misconduct if it persistently makes discourteous and disparaging remarks to defense counsel so as to discredit the defense or create the impression it is allying itself with the prosecution." (*People v. Carpenter* (1997) 15 Cal.4th 312, 353 (*Carpenter*).) As our high court has explained, "Although 'the trial court has both the duty and the discretion to control the conduct of the trial' [citations], 'the Due Process Clause clearly requires a "fair trial in a fair tribunal," [citation], before a judge with no actual bias against the defendant or interest in the outcome of his particular case. [Citations.] The role of a reviewing court 'is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial. [Citations.]' " (*People v. Harris* (2005) 37 Cal.4th 310, 346–347 (*Harris*).)

Moreover, the trial judge is authorized to " ' " 'participate in the examination of witnesses whenever he believes that he may fairly aid in eliciting the truth, in preventing misunderstanding, in clarifying the testimony or covering omissions, in allowing a witness his right of explanation, and in eliciting facts material to a just determination of the cause.' " [Citations.] [¶] The constraints on the trial judge's questioning of witnesses in the presence of a jury are akin to the limitations on the court's role as commentator. The trial judge's interrogation "must be . . . temperate, nonargumentative, and scrupulously fair. The trial court may not . . . withdraw material evidence from the jury's consideration, distort the record, expressly or impliedly direct a verdict, or otherwise usurp the jury's ultimate factfinding power." [Citations.]' " (*Harris*, *supra*, 37 Cal.4th at p. 350; see Evid. Code, § 775.) A defendant who fails to object to the court's questioning forfeits his claim on appeal. (*Harris*, at p. 350.)

Defendant has not met his burden to show the trial court committed misconduct. He makes no attempt to show that most of the rulings of which he now complains were erroneous. Nor has defendant shown that the court went beyond the bounds of

appropriate courtroom management in clarifying counsel's questions and the witnesses' answers. And although the trial court occasionally expressed impatience in front of the jury, the record does not show that the court "crossed the line into improper behavior," or that the defense suffered prejudice. (*Carpenter*, *supra*, 15 Cal.4th at p. 353.) Moreover, by failing to object to the court's rulings or questioning below, defendant has forfeited his claim on appeal. (See *Harris*, *supra*, 37 Cal.4th at p. 350.) Accordingly, we reject defendant's contention that the trial court committed prejudicial misconduct.[22]

## F. Sentencing Error

Defendant contends the trial court should have stayed his sentence for count three, possession of a firearm by a felon, pursuant to section 654, which provides in pertinent part: "(a) An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

Section 654's ban on multiple punishment applies where possession of a firearm is incidental to and simultaneous with the primary offense. (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1144 (*Jones*).) "[M]ultiple punishment is improper where the evidence 'demonstrates at most that fortuitous circumstances put the firearm in the defendant's hand only at the instant of committing another offense . . . .' " (*Ibid.*; see *People v. Ratcliff* (1990) 223 Cal.App.3d 1401, 1412 (*Ratcliff*).)[23] "On the other hand, it is clear that multiple punishment is proper where the evidence shows that the defendant possessed the firearm before the crime, with an independent intent." (*Jones*, at p. 1144.)

---

[22] Finding no prosecutorial or judicial misconduct, we reject defendant's claim that the combined effects of the ineffective assistance of counsel, prosecutorial misconduct, and judicial misconduct caused him cumulative prejudice.

[23] *Ratcliff* also noted: "A violation of section 12021, subdivision (a) is a relatively simple crime to commit: an ex-felon who owns, possesses, or has custody or control of a firearm commits a felony. *Implicitly, the crime is committed the instant the felon in any way has a firearm under his control*." (*Ratcliff*, *supra*, 223 Cal.App.3d at p. 1410, fn. omitted.)

*Jones* concludes that "*section 654 is inapplicable when the evidence shows that the defendant arrived at the scene of his or her primary crime already in possession of the firearm.*" (*Id.* at p. 1145, italics added.) Multiple punishment is also proper if the felon possessed the firearm after the crime, with a separate intent. (See *People v. Garcia* (2008) 167 Cal.App.4th 1550, 1565–1566.)

Whether section 654 applies is "a question of fact for the trial court, which is vested with broad latitude in making its determination. [Citations.] Its findings will not be reversed on appeal if there is any substantial evidence to support them. [Citations.] We review the trial court's determination in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence." (*Jones*, *supra*, 103 Cal.App.4th at p. 1143; see *People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1312–1313.)

The record here supports a conclusion that defendant did not fortuitously obtain possession of the gun only at the time of committing the primary offenses of murder and attempted murder. Harris testified that as he and Franklin rode down Ritchie Street, a car came around the corner and stopped, and defendant opened the passenger door and started shooting with a semiautomatic pistol. It is a reasonable inference that defendant arrived at the scene of the shootings already in possession of a firearm; under the rule of *Jones*, section 654 does not prohibit punishment for both crimes.

Defendant argues, however, that *Jones* was wrongly decided. According to defendant, *Jones* violates the rule of *Neal v. State of California* (1960) 55 Cal.2d 11, 19, which holds that "[w]hether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." We disagree. Nothing in the record gives rise to an inference that defendant's act of possessing the gun was "incident" to his objective in murdering Franklin and shooting at Harris.

We are not persuaded otherwise by defendant's citation to *People v. Duran* (1976) 16 Cal.3d 282, 296, fn. 16, in which our high court noted that there was no evidence the

40

defendant possessed the weapon in question (a blade) except during the assault that constituted his primary crime.  Unlike the case here, in *Duran* there were no witnesses who saw the stabbing.  (*Id*. at p. 287.)  We recognize that earlier cases concluded that punishment for both weapon possession and the offense in which the weapon was used is proper where there is evidence of a possession "distinctly antecedent and separate from the primary offense," but that it is not proper "where the evidence shows a possession only in conjunction with the primary offense."  (*People v. Venegas* (1970) 10 Cal.App.3d 814, 821; see *People v. Hays* (1983) 147 Cal.App.3d 534, 552–553 [no evidence of antecedent possession of rifle], *People v. Jurado* (1972) 25 Cal.App.3d 1027, 1029, 1033–1034 [police officers found gun on defendant after responding to silent alarm call; no evidence he possessed gun before or after burglary].)  However, in 2012, our Supreme Court endorsed the approach adopted by the Court of Appeal in *Jones*:  in *People v. Jones* (2012) 54 Cal.4th 350, 358, fn. 3, the court noted that its decision on the application of section 654 in context of multiple possession offenses was not intended to cast doubt on *Jones* and the cases upon which it relied.

Accordingly, we conclude the trial court did not err in imposing a concurrent sentence for count three.

### III.     DISPOSITION

The judgment is affirmed.

_____
Rivera, J.

We concur:


_____
Ruvolo, P.J.


_____
Reardon, J.